# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 19-0184V
UNPUBLISHED

| | |
|---|---|
| JANIS EDMINSTER,<br><br>               Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: March 23, 2023<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*Kristina E. Grigorian, Jeffrey S. Pop & Associates, Beverly Hills, CA,* for Petitioner.

*Camille Michelle Collett, U.S. Department of Justice, Washington, DC,* for Respondent.

## DECISION AWARDING DAMAGES[1]

On January 31, 2019, Janis Edminster filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a left shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on October 5, 2016. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters, and although Respondent conceded entitlement, the parties have been unable to agree to damages.

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$205,000.00**, **all of which is for actual pain and suffering. In addition, I award $15,005.36 for satisfaction of a Medicaid lien.**

## I.      Relevant Procedural History

Petitioner filed medical records and an affidavit on February 6, 2019 (ECF Nos. 6-7). On January 14, 2020, Respondent indicated that the case may be appropriate for informal resolution, and the parties began negotiations (ECF No. 17). However, on March 15, 2022, Petitioner reported that the parties had reached an impasse (ECF No. 42).

On April 28, 2022, Respondent filed his Rule 4(c) Report conceding that Petitioner was entitled to compensation for a Table SIRVA, and a ruling on entitlement was entered the following day (ECF Nos. 43, 44). Thereafter, the parties again attempted negotiations, but these also failed (ECF No. 48).

Petitioner filed a damages brief on August 30, 2022 (ECF No. 49). Respondent responded on October 31, 2022, and Petitioner replied on December 15, 2022 (ECF Nos. 50, 52). The issue of damages is now ripe for resolution.

## II.     Relevant Medical History

On October 5, 2016, while hospitalized for symptoms of a possible transient ischemic attack, Petitioner received a flu vaccine in her left arm. Ex. 3 at 8. After being transferred to another hospital, she reported that the night before she experienced tightness across her chest radiating to her back and down her left arm and jaw. Ex. 4 at 2. On October 6, 2016, she again reported "intermittent left arm and jaw tightness, lasting few seconds and resolves." *Id.* at 48. On October 7, 2016, she reported pain in her left arm described as "radiating to left jaw, left shoulder to left wrist" at a level of 4 out of 10. *Id.* at 327. She also reported occasional "chest/shoulder pain with musculoskeletal nature." *Id.* at 46. She was diagnosed with a cardiac condition and discharged. *Id.* at 2.

On October 11, 2016, Petitioner was seen by neurologist Dr. Rajiv Pathak. Ex. 11 at 45. Dr. Pathak noted that Petitioner had weakness and pain in her left arm, which was improving. *Id.* He recommended that she take ibuprofen as needed for pain in her left arm and neck. *Id.* at 47.

Petitioner was seen by Dr. Samuel Ceridon of Marshall Family Medicine on December 8, 2016 to follow up on her cardiac condition and left arm pain. Ex. 11 at 20. She reported left arm pain radiating up to her neck and down her arm for two months, since her hospitalization, and requested a referral to a specialist. *Id.* She attributed the pain to a flu injection. *Id.* Dr. Ceridon ordered an MRI. *Id.*

Petitioner returned to Dr. Ceridon on December 29, 2016 to follow up on her left arm pain and weakness. Ex. 11 at 16. She reported that her pain persisted but had improved. *Id.* She reported that a shoulder MRI was denied, and reluctantly agreed to try physical therapy ("PT"). *Id.*

On January 17, 2017, Petitioner underwent a PT evaluation for her left shoulder. Ex. 3 at 23. She reported that while hospitalized she received a flu shot, and thereafter began experiencing left arm weakness and left shoulder pain. *Id.* Over time, the pain spread down the entire left upper extremity to her wrist and over the left upper trapezius into the left cervical paraspinals. *Id.* She reported pain levels of 3/10 at best and 8/10 at worst. *Id.* On examination, her left shoulder passive range of motion ("ROM") was limited to 130 degrees of flexion, 90 degrees of abduction, 25 degrees of external rotation in 90 degrees of abduction, and 0 degrees of internal rotation in 90 degrees of adduction, all of which were painful.[3] *Id.* at 25. She was assessed as having decreased ROM and strength, with possible development of some left shoulder adhesive capsulitis. *Id.* A treatment plan was established for her to treat twice a week for five weeks. *Id.* at 26.

On January 31, 2017, Petitioner followed up with Dr. Ceridon about her left shoulder pain and an unrelated health matter. Ex. 11 at 13. The record indicated that her PT evaluation "was indicative of a Neuromuscular reaction to the injection." *Id.* Dr. Ceridon explained that it was normal for her arm to feel worse and weaker after the first few PT sessions, and recommended that she continue PT. *Id.*

On February 2, 2017, Petitioner returned to Dr. Pathak, who noted that she was experiencing intermittent left shoulder pain, for which she took ibuprofen. Ex. 11 at 37. Petitioner was later seen by nurse practitioner ("NP") Vickie Crosby of Marshall Family Medicine on February 28, 2017 to follow up on her left shoulder pain. Ex. 11 at 10. She reported that she had gained ROM through PT, but that her pain was unchanged. *Id.* On examination, she exhibited limited ROM and was highly sensitive to the TENS[4] unit electrode at the site of injection, her deltoid, but experienced some relief at a very low setting. *Id.* at 11. A TENS trial was recommended, along with an ointment. *Id.* She was instructed not to use NSAIDs. *Id.*

---

[3] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, 90 to 100 degrees in external rotation, and 70 to 90 degrees in internal rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 80, 84, 88 (F. A. Davis Co., 5th ed. 2016).

[4] TENS is an abbreviation for transcutaneous electrical nerve stimulation, which involves electrical stimulation of nerves that interferes with transmission of pain signals. *TENS* and *transcutaneous electrical nerve stimulation*, DORLAND'S ONLINE, https://www.dorlandsonline.com/dorland/definition?id=108464 (last visited Mar. 23, 2023).

On March 16, 2017, Petitioner returned to NP Crosby to return the TENS unit. Ex. 11 at 8. She reported that the TENS unit made her deltoid pain much worse, but improved her trapezius pain from a severity of 9/10 to 3-5/10. *Id.* She reported improved shoulder mobility. *Id.* She was still experiencing pain, especially at night. *Id.* NP Crosby believed that Petitioner's injection site may have nerve damage. *Id.*

Petitioner attended 14 PT sessions between January 17 and July 6, 2017. Ex. 6 at 3-13; 7 at 59-62. Initially, she experienced pain levels between five and eight out of ten. *Id.* In March 2017, her pain levels improved to one or two out of ten. Ex. 6 at 3-4. However, her pain levels rebounded to four to five out of ten in May and July 2017. Ex. 7 at 59-62.

Petitioner returned to NP Crosby on September 15, 2017, concerning her left shoulder pain. Ex. 11 at 2. The record indicates that Petitioner had seen PT for two rounds with improvement in ROM, and wished to return to PT. *Id.* She was given a PT referral and an MRI order. *Id.* at 3.

On October 3, 2017, Petitioner underwent another PT evaluation for her left shoulder pain. Ex. 7 at 37. She reported that her left shoulder pain had increased, and her shoulder had become more stiff. *Id.* She reported a shooting and electrical type of pain that ranged from 3-8/10, with intermittent tingling in her left hand and pain in her left elbow. *Id.* She also reported pain over her left upper trapezius and left posterior cervical paraspinals. *Id.* She reported that pain woke her up every night. *Id.* She was unable to do any heavy lifting or overhead lifting, and was not able to reach behind her back to fasten her bra or wash her lower back due to pain. *Id.* On examination, her left shoulder passive ROM was 140 degrees in flexion, 100 degrees in abduction, 50 degrees of external rotation, and 45 degrees of internal rotation. *Id.* at 38. She was assessed as having left shoulder pain, decreased strength, and decreased ROM, resulting in difficulty performing her regular activities of daily living. *Id.* Her treatment plan was to treat twice a week for six weeks. *Id.* at 39.

Petitioner attended approximately nine additional PT sessions between October 2017 and January 2018. Ex. 7 at 1-33. During this time, her pain levels varied between two to five out of ten. *Id.*

Petitioner underwent a left shoulder MRI on May 4, 2018. Ex. 8 at 1. The MRI revealed extensive tendinosis/tendinitis of the supraspinatus with probable associated articular surface partial tear, mild osteoarthritis, and minimal joint effusion and possible mild subacromial/subdeltoid bursitis. *Id.* at 1-2.

On May 31, 2018, Petitioner was seen by orthopedist Dr. Brandon Beamer for left shoulder pain. Ex. 9 at 17. Petitioner reported that she had had left shoulder pain for over

a year. *Id.* She reported pain radiating to the deltoid tuberosity that she related to a flu shot. *Id.* On examination, her left shoulder ROM was roughly symmetrical to the right side. *Id.* at 19. She had a mildly positive Speed test, and strongly positive Neer and Hawkins impingement tests. *Id.* at 20. Dr. Beamer administered a steroid injection, and noted that Petitioner "seemed to have a reaction after the injection," reporting numbness of her tongue and that she felt dizzy and tremulous. *Id.* He noted that she felt better after about 15 minutes. *Id.*

Petitioner returned to Dr. Beamer on July 31, 2018. Ex. 9 at 9. She reported that she felt much better after the cortisone injection. *Id.* On examination, her left shoulder ROM was unchanged from the previous visit. *Id.* at 12. Dr. Beamer noted that she had signs of biceps tendinitis, and in his view there was an inflammatory component to her condition. *Id.* at 9. He referred Petitioner for PT and provided a diclofenac prescription for inflammation. *Id.*

On October 23, 2018, Petitioner followed up with Dr. Beamer concerning her left shoulder pain. Ex. 9 at 1. Petitioner reported that she had been doing scapular stabilizing taping at PT which helped, signifying that there was an impingement component. *Id.* Her predominant difficulty was with overhead activities. *Id.* On examination, she had full active ROM. *Id.* at 4. She had positive Neer's impingement signs, and mildly positive Hawkins impingement signs. *Id.* Dr. Beamer provided an additional PT referral. *Id.* Petitioner was directed to return in six weeks, and if she was not improving they would discuss arthroscopy. *Id.*

Petitioner attended approximately 14 additional PT sessions between August 2018 and January 2019. Exs. 12 at 81-107; 16 at 159-164. Her pain levels ranged from zero to seven out of ten. *Id.* At her August 15, 2018 appointment, she reported that her worst pain in the past one to three months had been between eight and ten out of ten. Ex. 12 at 81.

Petitioner returned to Dr. Beamer on February 7, 2019 with continued significant left shoulder dysfunction. Ex. 16 at 152. She continued to have difficulty reaching overhead, and was waking at night due to her shoulder. *Id.* On examination, she had full active ROM but significant pain with Jobe's maneuver. *Id.* at 154. She had moderately positive belly test results, a strongly positive speeds test, and positive Neer and Hawkins impingement tests. *Id.* Because her condition was not improving despite a cortisone injection and PT, he determined that arthroscopic left shoulder surgery was indicated. *Id.* at 155.

Petitioner underwent left shoulder arthroscopic rotator cuff repair of the subscapularis and supraspinatus, as well as arthroscopic subacromial decompression, on July 15, 2019. Ex. 22 at 30.

On July 24, 2019, Petitioner underwent a postoperative PT evaluation. Ex. 17 at 39. She reported a pain level of two out of ten at present, but nine out of ten at worst. *Id.* She reported a pain level of eight out of ten when changing positions between sitting and supine positions. *Id.* Her passive ROM in flexion was 0-50 degrees, and she exhibited significant fear and guarding. *Id.* at 39-40. She was unable to perform many activities of daily living, such as opening a tight or new jar, carrying a shopping bag or briefcase, washing her back, or using a knife to cut food. *Id.* at 34.

On December 17, 2019, Petitioner returned to Dr. Beamer. Ex 22 at 11. She reported worsening pain and dysfunction. *Id.* On examination, she exhibited pain and weakness with Jobe's maneuver, which Dr. Beamer interpreted as suggesting possible re-tearing of her rotator cuff. *Id.* at 14. She was tender along the bicipital groove, and had positive Speed's impingement signs. *Id.* Dr. Beamer ordered another shoulder MRI. *Id.* at 11.

Petitioner underwent a second left shoulder MRI on December 28, 2019. Ex. 22 at 38. The MRI revealed tendinopathy of the supraspinatus tendon, without evidence of a tear. *Id.* at 39. There was fluid in the subacromial and subdeltoid spaces, which was deemed likely bursitis. *Id.* There was a small glenohumeral joint effusion and arthrosis. *Id.*

Petitioner returned to Dr. Beamer on January 3, 2020. Ex. 22 at 6. She reported that her pain was worsening. *Id.* Dr. Beamer noted that the second MRI showed bursitis, but no repeat tear. *Id.* He noted that Petitioner had "a terrible reaction to a cortisone shot" he had done previously. *Id.* On examination, her left shoulder passive ROM was full, but her active ROM was limited to about 140 degrees of forward flexion. *Id.* at 9. Impingement maneuvers caused pain, as did speeds test; however, she was nontender over the bicipital groove. *Id.* Dr. Beamer did not suspect infection, and prescribed diclofenac and referred Petitioner for more PT. *Id.*

On January 31, 2020, Petitioner returned to Dr. Beamer. Ex. 22 at 1. Diclofenac was helping, but Dr. Beamer stated that he could not keep her on that long term. *Id.* On examination, her left shoulder passive ROM was slightly reduced. *Id.* at 4. Dr. Beamer discussed doing a platelet rich plasma injection "since she is allergic to cortisone." *Id.*

Petitioner attended 42 PT sessions between July 2019 and June 2020. Exs. 17 at 3-39; 23 at 2-42; 25 at 2-18, 99-100. In July 2019, her pain levels were between two and nine out of ten. Ex. 17 at 33-39. However, by August 2019, her pain levels had lowered to two out of ten. *Id.* at 19-23. Thereafter, her pain levels ranged from one to three from

September 2019 to June 2020. Exs. 17 at 3-39; 23 at 2-42; 25 at 2-18, 99-100. Her ROM gradually improved over this time period as well. *Id.*

On June 11, 2020, Petitioner returned to Dr. Beamer. Ex. 26 at 31. She reported that her pain had not completely gone away, and she continued to experience pain with overhead activities. *Id.* She also felt popping, and like "something catches" from time to time. *Id.* She was not seeing much improvement with PT. *Id.* On examination, she had nearly full active ROM. *Id.* At 34. She exhibited pain with Jobe's maneuver, and positive Neer and Hawkins signs. *Id.* Dr. Beamer assessed Petitioner with ongoing left shoulder dysfunction nearly a year after rotator cuff repair and ordered a repeat MRI. *Id.*

Petitioner underwent a left shoulder MRI on June 29, 2020. Ex. 26 at 22. The MRI revealed a probable recurrent partial tear of the supraspinatus tendon, with a suspected pinhole full-thickness tear allowing joint effusion to enter the subacromial-subdeltoid bursa. *Id.* The MRI also revealed probable mild tendinosis/tendinitis of the infraspinatus and subscapularis and mild to moderate osteoarthritis of the glenohumeral and acromioclavicular joints. *Id.*

Petitioner returned to Dr. Beamer on July 16, 2020 to review the MRI findings. Ex. 26 at 13. On examination, she was "very tender" over the bicipital groove. *Id.* at 16. She had pain with Jobe's maneuver, a strongly positive O'Brien's test, and positive Neer and Hawkins signs. *Id.* She reported two or three episodes a day of sharp pain in her shoulder and a catching sensation, which Dr. Beamer deemed unacceptable. *Id.* He noted that she was "allergic to cortisone injection so we cannot do that," and determined that the only reasonable option was to reexplore the shoulder repair surgically. *Id.*

Petitioner underwent a second left shoulder surgery on November 30, 2020. Ex. 27 at 7. Dr. Beamer performed a revision to a left rotator cuff repair, extensive intra-articular debridement, and open subpectoral biceps tenodesis. *Id.*

On December 15, 2020, Petitioner had a post-operative consult with Dr. Beamer. Ex. 29 at 9. She reported less pain than after the prior surgery. *Id.* On examination, her incisions were well-healed, and there were no signs of infection. *Id.* at 12. She was directed to wear a sling for four weeks, and return in a month. *Id.*

Petitioner was seen by Dr. Beamer on January 12, 2021, reporting that she was doing well and her biceps pain was gone. Ex. 29 at 2. She had stiffness from surgery. *Id.* On examination, her forward flexion was limited to about 95 degrees with pain, external rotation in adduction was 20 degrees, and abduction 80 degrees. *Id.* at 5.

Petitioner attended another 31 PT sessions between December 2020 and September 2021. Ex. 28 at 1-26; 30 at 1-15; 31 at 1-10; 33 at 1-14. In December 2020, her pain levels ranged between four and eight out of 10, and her passive ROM was 80 degrees in flexion, 25 degrees in external rotation, 40 degrees in internal rotation, and 45 degrees in abduction. Ex. 28 at 26. Her pain levels gradually improved, and by February 2021 her pain levels were one out of ten at best and four out of ten at worst. *Id.* at 8. Her ROM gradually improved over time, and by February 2021 she exhibited passive ROM of 155 degrees in flexion, 60 degrees in external rotation, and 40 degrees in internal rotation. *Id.* By May 2021, at best she had no pain, and at worst it was five out of ten. Ex. 31 at 2. At her final PT appointment on September 3, 2021, she had no pain at best, and four out of ten at worst. Ex. 33 at 1. However, she was "still unable to lift arm all the way overhead due to pain and catching sensation." *Id.*

### III.    Affidavit Evidence

Petitioner filed an affidavit in support of her claim. Ex. 1. Petitioner avers that she developed pain in her left shoulder and upper arm immediately after vaccine administration. *Id.* at ¶ 7. She states that she reported her shoulder pain to emergency personnel who transported her by ambulance to another hospital, and reported it at the second hospital while undergoing treatment for a heart condition as well, and consequently received pain medication. *Id.* at ¶ 8. During her hospitalization, she continued to experience severe left arm pain, and continued to receive pain medication for it. *Id.* at ¶¶ 9-10.

Petitioner averred that when she reported for PT, she was experiencing difficulties getting dressed, washing her hair, and reaching behind her back. Ex. 1 at ¶ 19. She asserts that on May 31, 2018 she underwent a cortisone injection, after which she felt dizzy, her tongue went numb, and she had convulsions for several minutes and was unable to talk or move. *Id.* at ¶ 39. She states that Dr. Beamer told her that she had an allergic reaction to the injection, and should not have it again. *Id.*

### IV.    The Parties' Arguments

A review of the briefs reveals little factual disagreement.[5] The parties agree that Petitioner's injury duration was approximately five years; that she underwent two shoulder

---

[5] At most ,the parties present certain events differently, with Petitioner asserting that she experienced a severe allergic reaction, including dizziness, numbness, convulsions, and transient inability to talk or move, to a cortisone injection while Respondent asserts that Petitioner was lightheaded and monitored for 15 minutes. Br. at 11; Opp. at 6. Respondent also asserts that Petitioner's treatment included three rounds of PT, with 39 sessions before the first surgery and 72 sessions between July 24, 2019 and September 3, 2021, which would total 111 sessions. Opp. at 4,10. Petitioner, however, describes her PT as "at least 5 rounds of physical therapy totaling 112 physical therapy sessions." Petitioner's Reply at 2. I need not resolve these disputes, however, since they are not material to my ultimate finding on pain and suffering.

surgeries; and that her treatment included one cortisone injection, at least 111 physical therapy sessions, and pain medication. Petitioner's Brief ("Br.") at 1; Respondent's Opposition ("Opp.") at 4, 8, 10. The parties further agree on the amount of the Medicaid lien ($15,005.36), to be paid for treatment costs Petitioner incurred in association with her SIRVA. Br. at 23; Opp. at 2 n.1. Thus, only pain and suffering is disputed.

Petitioner asserts that I should award $205,000.00 in pain and suffering, given the severity of her SIRVA. Br. at 18, 23. She believes her case is similar to not less than six prior decisions, though she particularly highlights two cases in which the petitioners received awards of $205,000 - *Lawson* and *Elmakky*.[6] Br. at 23. Thus, Petitioner argues that the award in this case should be similar. *Id.*

Respondent favors an award of $170,000.00 in pain and suffering as reasonable and appropriate. Opp. at 2. Respondent cites only one comparable case, *Pruitt*, in which the petitioner was awarded a slightly higher sum, $185,000.00.[7] Opp. at 14-15. *Pruitt* involved a petitioner who underwent two surgeries and approximately four years of active treatment. *Id.* Respondent acknowledges that Ms. Edminster treated for longer, but argues that the petitioner in *Pruitt* experienced a slightly higher pain rating at her last documented office visit and received two cortisone injections and two Medrol DosePaks. *Id.* Respondent also notes that the petitioner in *Pruitt* underwent the first surgical intervention at ten months, compared to two years and nine months in this case, suggesting that this means that the injury in this case did not require as urgent attention. *Id.*

Respondent also speculates that Petitioner's age, and likely associated age-related shoulder pathologies, may have contributed to her symptoms. Opp. at 10-14. And he seeks to distinguish the cases relied on by Petitioner. Opp. at 11-13. The *Lawson* petitioner, for example, underwent three surgeries, seven steroid injections, four rounds of PT, six MRIs, and received platelet-rich plasma injections, which Respondent characterizes as "unquestionably more interventions than petitioner in this case." Opp. at 13. *Elmakky* involved three surgeries over four years, though (as Respondent admits) Ms. Edminster actually treated for slightly longer. *Id.* Respondent distinguishes

---

[6] *Lawson v. Sec'y of Health & Human Servs.*, No. 18-0882V, 2021 WL 688560 (Fed. Cl. Spec. Mstr. Jan. 5, 2021); *Elmakky v. Sec'y of Health & Human Servs.*, No. 17-2032V, 2021 WL 6285619 (Fed. Cl. Spec. Mstr. Dec. 3, 2021).

[7] *Pruitt v. Sec'y of Health & Human Servs.*, No. 17-0757V, 2021 WL 5292022 (Fed. Cl. Spec. Mstr. Oct. 29, 2021).

*McDorman*[8] because that petitioner underwent her first surgery much sooner, five months after vaccination.

## V.      Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[9] *Hodges v. Sec'y of*

---

[8] *McDorman v. Sec'y of Health & Human Servs.*, No. 19-814V, 2021 WL 5504698 (Fed. Cl. Spec. Mstr. Oct. 18, 2021).

[9] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were

*Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap

## VI.    Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

Ms. Edminster complained of shoulder pain within a day of vaccine administration, and treated until fifty-nine months – nearly five years – thereafter. She underwent two shoulder surgeries, one cortisone injection with an adverse reaction, and at least 111 sessions of PT. She experienced moderate restrictions in ROM. While she did not undergo surgery until nearly three years after vaccination, during that timeframe she engaged in 39 PT sessions and received a cortisone injection, undercutting Respondent's suggestion that the surgery delay alone proved a lack of urgency.

Respondent cites only one case, *Pruitt*, which I find not to be comparable to this

_____

assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

case and therefore not particularly helpful. While the overall duration of the injury in *Pruitt* is similar, the petitioner in that case had a nearly two year gap in treatment. *Pruitt* at *3. In this case, other than intermittent gaps of three to seven months, Petitioner treated consistently for nearly five years. In addition, the petitioner in *Pruitt* appears to have attended only 14 PT sessions, compared to nearly tenfold more here.

This case is most comparable to *Lawson* and *McDorman*. The *Lawson* petitioner underwent three shoulder surgeries (although I questioned whether the final one was fully attributable to her SIRVA). *Lawson* at *5-6. The petitioner in that case also received seven cortisone injections, four rounds of PT with 28 sessions, and platelet rich plasma injections. *Id.* The petitioner in the present case underwent two surgeries, one cortisone injection with an adverse reaction, and five rounds of PT totaling 111 sessions. I awarded $200,000.00 in pain and suffering in *McDorman*.[10] That petitioner also underwent two surgeries and multiple rounds of PT. Both petitioners had an approximately two to three year period of more intensely painful injury. The petitioner in *McDorman* had several more cortisone injections, while Ms. Edminster attended dozens more PT sessions and had an overall longer duration of injury.

The sole case Respondent relies on, *Pruitt*, is simply not comparable to this case. Even if it were, it would not support Respondent's proposed award of $170,000.00, given that the petitioner in *Pruitt* was awarded $185,000. In my view, the fact that Respondent has not cited *any* cases that support his proposed award suggests that Respondent cannot defend his own position, and weighs in Petitioner's favor.

Respondent's contention that I should discount Petitioner's damages because her MRIs showed degenerative changes is not persuasive. Whatever dormant shoulder pathology Petitioner may have had prior to vaccination, I find it compelling that before vaccination Petitioner was *not symptomatic*, yet after vaccination she was. Indeed, Petitioner's shoulder pain was immediately concerning enough that she reported it during a hospitalization for a more serious condition relating to her heart.

Petitioner suffered a SIRVA injury that was in the mild to moderate range, but continued for a significant amount of time, fifty-nine months, and involved surgery and significant amounts of treatment. Petitioner has cited reasonable comparables that support her position, while Respondent has not. I find that Petitioner has substantiated the amount sought for past pain and suffering.

---

[10] *McDorman v. Sec'y of Health & Human Servs.*, No. 19-814V, 2021 WL 5504698 (Fed. Cl. Spec. Mstr. Oct. 18, 2021).

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $205,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[11]

**Based on the record as a whole and arguments of the parties, I award Petitioner the following:**

- **A lump sum payment of $205,000.00 (for actual pain and suffering), in the form of a check payable to Petitioner; and**

- **A lump sum payment of $15,005.36, representing compensation for satisfaction of a State of California Medi-Cal lien, in the form of a check payable jointly to Petitioner and:**

> **Department of Health Care Services**
> **Recovery Branch – MS 4720**
> **P.O. Box 997421**
> **Sacramento, CA 95899-7421**
> **DHCS Account Number C93371863F-VAC03**

**Petitioner agrees to endorse this payment to the Department of Health Care Services, State of California, for satisfaction of the California Medicaid lien.**

**These amounts represent compensation for all damages that would be available under Section 15(a).**

The Clerk of Court is directed to enter judgment in accordance with this decision.[12]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[11] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.